**ST. JAMES HOSPITAL, Plaintiff,**

v.

**Patricia Roberts HARRIS, Secretary, Department of Health and Human Services, Defendant.**

**No. 80 C 735.**

United States District Court, N. D. Illinois, E. D.

Dec. 4, 1981.

Leonard C. Homer, Ober, Grimes & Shriver, Baltimore, Md., K. Bruce Stickler, Wood, Lucksinger & Epstein, Chicago, Ill., for plaintiff.

Robert. D. Nesler, Washington, D. C., Mary S. Rigdon, Asst. U. S. Atty., Chicago, Ill., for defendant.

## MEMORANDUM

LEIGHTON, District Judge.

This civil action arises from a dispute between a hospital and the Secretary of Health and Human Services concerning reimbursement under the Medicare Act of two classes of costs: (1) those the hospital incurred in providing medical care to indigent patients, a requirement imposed by

statute and rules on hospitals which have received Hill-Burton construction grants; and (2) those incurred by the hospital in providing bedside telephones to Medicare beneficiaries. The hospital, proceeding under regulations adopted by the Secretary, made a self-disallowance as to the telephone costs and submitted a report for reimbursement of the costs incurred in furnishing medical care to indigent patients; they were denied. It appealed to the Provider Reimbursement Review Board in accordance with 42 U.S.C. § 1395oo; the Intermediary's decision was upheld. The Secretary's responsible subordinate, the Administrator of the Health Care Financing Administration, declined to affirm, reverse, or modify the Board's decisions, thereby allowing them to stand.

This suit, invoking jurisdiction pursuant to 42 U.S.C. § 1395oo (d) and procedurally governed by 5 U.S.C. §§ 701 *et seq.*, requires review of the Secretary's decisions which may be overturned only if they were arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, or unsupported by substantial evidence. The cause is before the court on cross-motions for summary judgment. There are no material issues of fact to be resolved. This being so, and from applicable law, the court concludes that on the issue whether, for the year in question, Medicare should reimburse the hospital a percentage of the costs it incurred in connection with its obligations under the Hill-Burton Act to provide free medical care to indigents; and on the issue whether for the same year the hospital should be reimbursed the costs it incurred in furnishing Medicare patients with bedside telephones, St. James is entitled to judgment as a matter of law. Therefore, its motion for summary judgment is granted; the Secretary's is denied.

I

St. James Hospital is a short-term, acute care general hospital located in Chicago Heights, Illinois. It is a qualified provider of medical services under Part A of the Medicare program, Title XVIII of the So-

cial Security Act, 42 U.S.C. §§ 1395c *et seq.*, which Congress enacted in 1965. These provisions of the Act furnish federal funding of medical care for the aged and disabled. Under these provisions, participating providers of health services like St. James Hospital, are reimbursed from trust funds for the "reasonable cost" of covered services. As defined in 42 U.S.C. § 1395x(v)(1)(A), "reasonable cost" means the actual cost of providing in-patient hospital care; it is an all-inclusive term, unless specifically identified and excluded by 42 U.S.C. § 1395y. Therefore, the Medicare program reimburses hospitals providing services to Medicare beneficiaries the lesser of their charges or the reasonable cost of furnishing such services.

The Secretary of Health and Human Services administers the program through fiscal intermediaries who review cost reports submitted by providers, and who determine the amount of costs that will be reimbursed. Fiscal intermediaries and other agents of the Secretary are guided by rules and regulations which must be consistent with the statute and necessary to the efficient discharge of the statutory functions. 42 C.F.R. § 405.420(g) is the regulation controlling the Hill-Burton issue, reimbursement of the claimed percentage of uncompensated care costs. It provides, in relevant part, that "[c]harity allowances have no relationship to beneficiaries of the health insurance program and are not allowable costs." The statutory provision authorizing publication of this regulation is 42 U.S.C. § 1395x(v)(1)(A) which states that "[t]he reasonable costs of any services shall be the cost actually incurred, ... and shall be determined in accordance with regulations establishing the method or methods to be used, and the items to be included...."

Between the years 1959 and 1967, St. James, as part of construction financing transactions, received Hill-Burton grants totaling $1,593,000. A condition of these grants, as provided in 42 U.S.C. § 291e(e)(2), was the obligation of the hospital to furnish indigents access to a reasonable volume of free or reduced-cost medical

care. Accordingly, St. James provided free or reduced-cost care to those unable to pay, persons who were emergency cases or were in urgent need of hospital services. However, in 1972, as a result of litigation concerning obligations of Hill-Burton grantees, the Secretary promulgated 42 C.F.R. § 53.-111 which, in Subparagraph (d), established a presumptive compliance guideline and furnished three methods of proving that a hospital has complied with the terms of a grant. St. James chose one of these and proceeded to budget for and pay the cost of uncompensated care for those unable to pay. In 1977, the year at issue in this case, and based on the adopted formula, the hospital provided such care in the amount of $159,300. This was a substantial monetary increase over the value of uncompensated care which St. James had provided prior to promulgation of the regulation. Then, spreading the total cost of uncompensated medical care for 1977 throughout its hospital operations, St. James calculated the percentage of its hospital services represented by Medicare patients and concluded that the same percentage of uncompensated care costs was a "reasonable cost" it had incurred in furnishing medical care to Medicare beneficiaries. It treated this amount as a cost arising out of a financial transaction; that is, the Hill-Burton construction grants. St. James included this sum in its 1977 cost report and asked for reimbursement of this amount. The Intermediary disallowed reimbursement on the ground that uncompensated care represented charity within the meaning of the Secretary's regulation, 42 C.F.R. § 405.420. With one of its three members dissenting, the Provider Reimbursement Review Board upheld the Intermediary; the disallowance ultimately became the Secretary's decision.

In the same cost year, St. James furnished bedside telephones used by staff and physician, personnel for hospital purposes and by patients for personal use. Use of the telephones by hospital personnel included alerting the cardiac resuscitation team, calling for inhalation therapy, physical therapy, patient transport, and administrative personnel in the normal course of their duties. Patient usage of the telephones included not only communication with friends and family members, but also contacts with hospital staff persons such as the ombudsman, admitting and discharging personnel and social workers. In completing the cost report, St. James followed Section 2601.1 of the Provider Reimbursement Manual, but particularly, the Secretary's regulation published in 42 C.F.R. § 405.310(j) and providing that

Notwithstanding any other provisions of this Part 405, no payment may be made for any expenses incurred for the following items or services:

\*    \*    \*    \*    \*    \*

(j) Personal comfort items and services (for example a television set, or telephone service, etc.).

A provision of the Medicare Act, 42 U.S.C. § 1395y(a)(6) excludes certain costs from coverage by stating that

Notwithstanding any other provision of this subchapter, no payment may be made under part A or part B of this subchapter for any expenses incurred for items or services—

\*    \*    \*    \*    \*    \*

(6) which constitute personal comfort items;

Prompted by what these sources instructed, all of them emanating from either the Secretary or her subordinates, the hospital made cost entries on Worksheet A–8 of its 1977 cost report. This operated to effect a self-disallowance of the patient telephone costs and thus obviated any need for an adjustment by the Intermediary.

The Intermediary denied all the reimbursements claimed in the cost report, and thereafter, St. James joined a number of Florida hospitals in a group appeal challenging refusal of the Medicare program to reimburse the costs of patient bedside telephones and, in the alternative, Medicare's requirement that average costing be used to determine the amount of non-allowable patient telephone costs rather than incremental or direct costing. The hospitals supported their claim for reimbursement of

bedside telephone costs with clinical studies and expert medical testimony which they claimed demonstrated that for a hospital patient a bedside telephone was a part of therapy rather than an item of personal comfort. The Intermediary countered this evidence with the testimony of a college professor whose opinion was that the studies conducted by the hospitals were not statistically valid; he expressed the objection that they had been conducted by using an opportunity sample in which all consenting patients over the age of 18 were tested, rather than a sample that not only chose randomly among a hospital's patients, but included nonhospitalized members of the community.

After hearing the case, the Board found "[t]hat the Providers involved in this appeal [St. James and the Florida hospitals], have conducted in-depth studies and offered expert testimony which demonstrated that patient telephones have therapeutic value. The Board is very impressed with the Providers' arguments and, in fact, agrees that the patient telephone should be a covered service. However, this Board does not have the authority to rule on coverage issues and is locked into the Regulation that states that the patient telephone is a luxury item. The Board finds that the controlling Regulations and Program Policy require the exclusion from allowable costs of all costs associated with telephone services and other personal comfort items which are used for the convenience of patients." On these findings, the Board decided "[t]hat the Intermediary's adjustment to disallow patient telephone cost is affirmed." This decision, as in the Hill-Burton issue, also became that of the Secretary.

II

A

In support of the contention that it is entitled to judgment as a matter of law on the free medical care issue, St. James Hospital argues that the Provider Reimbursement Review Board erred in finding the Intermediary presented substantial evidence which showed that the Hill-Burton

uncompensated care costs constituted charity care. As a matter of fact, argues the hospital, the record before the Board, and thus the one before the Secretary, showed that the Intermediary did not present any evidence. According to the hospital, its evidence established, without contradiction, that the free care it gave to indigents during the cost year involved was rendered by it pursuant to legal compulsion under Hill-Burton regulations, 42 C.F.R. §§ 53.111, 124.06 and 124.607(b), all of them directions issued to hospitals like St. James by the Secretary. Noncompliance with the Secretary's regulations meant possible loss of licensure, and enforcement against it of contractual obligations it assumed under the grant agreements to provide such services. The hospital argues that the uncompensated care it furnished (1) was not rendered voluntarily, (2) would not have been furnished but for the legal compulsion enforced by the Secretary, (3) constituted a cost of providing care through the Hill-Burton financed facility just as interest and other financing costs are costs of providing care, and (4) generated costs which would be shifted to and paid by non-Medicare patients if Medicare does not bear its share of such financing obligations. As against all of its evidence, according to St. James, the Intermediary supported disallowance with only a series of documents consisting mostly of excerpts from the legislative history of the Medicare Act.

The Secretary counters with the argument that in the light of unequivocal statutory language in both the Medicare and Hill-Burton statutes, she had determined, and her subordinates had properly decided, that the costs of providing uncompensated care to non-Medicare beneficiaries should not be borne by the Medicare program. She insists that St. James is seeking reimbursement from Medicare trust funds for costs it was required to incur in complying with assurances it had given in return for Hill-Burton grant aids. The Secretary argues that hospitals, like St. James, which have received Hill-Burton assistance, are obliged by law, and by the terms of their

grants, to provide a reasonable level of uncompensated care to indigent persons; and that St. James' position in this case concerning reimbursement of free care costs is contrary to the unequivocal language of the Medicare Act which precludes reimbursement by the program for services rendered to persons not covered by its provisions. Congress, the Secretary insists, has given her wide latitude in determining what constitutes reasonable costs. In exercising this congressional authority, she has determined that reasonable costs do not include charity allowances which she defines as reductions in revenue by the provider of services because of the indigence of the patient. Charity allowances, argues the Secretary, bear no relationship to beneficiaries of the Medicare program; and she points to what she interprets as the controlling regulations, 42 C.F.R. § 405.420 Subparagraphs (b)(2) and (g) defining "charity allowances", and where she has stated that "[c]harity allowances have no relationship to beneficiaries of the health insurance program and are not allowable costs."

## B

Concerning its claim that Medicare should reimburse a provider the costs it incurred in furnishing Medicare patients with bedside telephones, St. James argues it was error for the Board to determine that 42 C.F.R. § 405.310(j) requires disallowance of such costs despite the Board's recognition that there was evidence which showed telephones so used had therapeutic value; and despite the Board's conclusion that such costs should be reimbursable under the Medicare program. St. James argues that given the evidence introduced by the hospitals at the joint hearing, evidence which showed that patient bedside telephones had therapeutic value, the Secretary's regulation should not be read to preclude reimbursement of such costs because 42 U.S.C. § 1395y(a)(6), the statute which the regulatory provision seeks to interpret, only proscribes reimbursement of expenses "which constitute personal comfort items...." The legislative history of this statute, the hospital insists, does not preclude reim-

bursement to a provider of costs for bedside telephones furnished patients unless it can be established that the telephones were not furnished by the hospital as part of therapy, but requested by a patient for his or her personal comfort. And, insists the hospital, if the Secretary's regulation, 42 C.F.R. § 405.310(j), does require disallowance of patient bedside telephone costs, it contravenes the underlying purposes of the Medicare Act, and constitutes action by the Secretary that would violate protected constitutional rights of a provider like St. James.

The Secretary responds with an argument that first raises a question of procedure. She argues that this Court lacks subject matter jurisdiction over the claim because the Board refused to rule on St. James' self-adjusting disallowance for the patient bedside telephone costs. Only the Intermediary, which did not act, says the Secretary, could have re-opened St. James' 1977 cost report; and no such action was taken; therefore, there is nothing, as to the telephone cost claim, for this court to review.

St. James, however, argues that the Board erred procedurally in refusing to assert jurisdiction over the claim concerning the bedside telephones, one concerning which, admittedly, the Intermediary made no adjustment. It contends that the procedure followed was one directed by the Secretary in her instructions not only in regulations but in the provisions of Chapter 21 of the Provider Reimbursement Manual (Section 2106.01). The hospital insists that denial to it of a hearing on this claim by the Board's refusal to entertain jurisdiction, and the Secretary's argument attacking this court's power to review, will close access to judicial review of an arbitrary and capricious decision.

In addition, the Secretary questions this court's subject matter jurisdiction to review the Intermediary's determination in the Florida appeal that costs incurred in furnishing patients bedside telephones are not reimbursable on the ground that 42 U.S.C. § 1395oo(g) limits the Board's review. That statute provides:

The finding of a fiscal intermediary that no payment may be made under this subchapter for any expenses incurred for items or services furnished to an individual because of this title shall not be reviewed by the Board, or by any court pursuant to an action brought under subsection (f) of this section.

As to the merits of the issue, the Secretary argues that 42 C.F.R. § 405.310(j), her regulation excluding coverage of private patient telephones as personal comfort items, is valid because it is reasonably related to the purposes of the Medicare Act. She argues that applicable statutory provisions support her decision to exclude patient bedside telephones from Medicare reimbursement because they are personal comfort items; and in any event, evidence presented to the Board in the joint appeal did not establish the therapeutic value of private, in-room patient telephones. Thus, it can be seen that resolution of the issues presented requires this court to determine whether the Secretary has correctly construed the applicable provisions of the Medicare Act, and has reasonably applied the regulations on which she relies for disallowance of the costs reimbursements in this case.

III

■ Generally, when the meaning of a regulation is within the expertise of an agency, courts will defer to that agency's construction. This is so because the agency's expertise makes it particularly suited to interpret the language of its regulations; and ordinarily its construction will be affirmed if it is not clearly erroneous or inconsistent with other regulations. *Pacific Coast Medical Enterprises v. Harris*, 633 F.2d 123, 131 (9th Cir. 1980); *see Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). Particularly is this true where the agency expertise is in a substantive area, and where the regulations were promulgated pursuant to congressional authorization. *White Memorial Medical Center v. Schweiker*, 640 F.2d 1126, 1129 (9th Cir. 1981); *Mercy Hospital and Medical*

*Center, San Diego v. Harris*, 625 F.2d 905, 907·(9th Cir. 1980). However, the deference which a court will afford an agency's interpretation of its regulations is not total, *Pacific Coast Medical Enterprises v. Harris, supra*; the degree of such deference varies with circumstances. *St. John's Hickey Memorial Hospital v. Califano*, 599 F.2d 803, 812 (7th Cir. 1979).

■ As to another aspect, the scope of this court's review of the final decisions of the Secretary is determined by the provisions of Section 701 *et seq.* of Title 5, U.S.C., pursuant to Section 1878(f) of the Social Security Act, 42 U.S.C. § 1395*oo* (f). *Pacific Coast Medical Enterprises v. Califano*, 440 F.Supp. 296, 303 (C.D.Cal.1977). Thus guided, this court must determine whether the decisions under review were based on a consideration of the relevant factors, or whether there has been a clear error of judgment. "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Bowman Transportation, Inc. v. Arkansas-Best Freight System, Inc.*, 419 U.S. 281, 285, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974), quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).

A

In this case, the record before the Secretary contained uncontradicted evidence that in 1977, the cost year at issue, St. James Hospital was obliged by law to budget for and pay the costs of uncompensated care furnished those unable to pay. This obligation was imposed by the Hill-Burton Act, 42 U.S.C. §§ 291 *et seq.*, the statute under which St. James, during the period 1959 and 1967, received grants totaling $1,593,000 as part of construction financing transactions.

The terms of 42 C.F.R. § 53.111 by which the Secretary enforces this obligation are mandatory. Subparagraph (d) of the regulation required a Hill-Burton grantee hospital like St. James to show compliance by either budgeting for the support of or mak-

ing available on request, uncompensated services at a level not less than the lesser of 3% of operating costs, 10% of the Hill-Burton grants received, or adoption of a policy that did not exclude any person from admission on the ground that such person is unable to pay for needed services.

St. James chose the second of the three methods of compliance. In the community served, it treated both Medicare and non-Medicare patients. It incurred and incurs reasonable and necessary costs in providing medical care to its general patient population. One of these costs is the maintenance of the facilities it constructed, financed by the grants received under the Hill-Burton Act. In the year 1977, the year at issue, St. James treated the uncompensated care it furnished those unable to pay as a cost incurred in furnishing hospital services. Before the Intermediary, and in its appeal to the Provider Reimbursement Review Board, St. James produced evidence showing it had determined the percentage its Medicare patients represented to its general patient population; and utilizing that formula, calculated that Medicare's portion of the $159,300 uncompensated care for 1977 was $42,000.

It was this amount for which St. James sought reimbursement in its cost report from the Medicare program. The Intermediary disallowed this reimbursement request on the ground that the sums paid by St. James to furnish uncompensated care to those unable to pay represented charity within the meaning of 42 C.F.R. § 405.-420(c). The Intermediary did not introduce evidence; it relied entirely on excerpts from provisions of the Medicare Act and on 42 C.F.R. § 405.420(c). This regulation attempts to deal with normal accounting treatment of factors which affect costs, and provides that "[b]ad debts, charity, and courtesy allowances represent reductions in revenue." Subparagraph (g) thereof categorically states that "[c]harity allowances have no relationship to beneficiaries of the health insurance program and are not allowable costs."

It is worth noting that this regulation does not define charity to include costs which a provider incurs in rendering uncompensated care to indigents, and thus not an allowable reimbursement. In those portions of its provisions that deal with the concept of charity, the regulation merely states a conclusion which every provider knows: free medical service to an indigent patient reduces revenue. Indeed, the regulation does not define the word "charity" as it is used by the Secretary.

It has been said that "'[c]harity' is a matter of description rather than of precise definition, and each case involving determination of that which is charitable must be decided on its own particular facts or circumstances." *Topeka Presbyterian Manor, Inc. v. Board of County Commissioners of Shawnee County*, 195 Kan. 90, 402 P.2d 802, 806 (1965); *overruled on other grounds, Lutheran Home, Inc. v. Board of County Commissioners*, 211 Kan. 270, 505 P.2d 1118 (1973). Mr. Binney, in his famous and widely quoted argument in the Girard will case, defined charity as "[w]hatever is given for the love of God or the love of your neighbor, in the catholic and universal sense, given from these motives and to these ends, free from the stain or taint of every consideration that is personal, private, or selfish." *Vidal v. Girard's Executors*, 2 How. 128, 11 L.Ed. 205 (1844); *see Ould v. Washington Hospital*, 95 U.S. 303, 311, 24 L.Ed. 450 (1877). A characteristic of charity is that it is boundless. Paul, when he wrote to the Corinthians, told them that "Charity never ends...." 1 Cor. 13:8 (King James). "Charity", the Court of Appeals for the Third Circuit has had occasion to say, "means such unselfish things as are wont to be done by those who are animated by the virtue of love." *Bok v. McCaughn*, 42 F.2d 616, 619 (3rd Cir. 1930).

■ Without appearing to be unkind, this court will not hesitate to say that when, during the year 1977, St. James furnished uncompensated care to medical indigents, it was not animated by the virtue of love; its motives were not free of personal, private, or selfish interests; the fact it limited the

amount of uncompensated care it would render to 10% of its Hill-Burton grants shows its largesse was not boundless. Therefore, the Secretary's characterization of St. James' 1977 uncompensated care costs as charity, when it was not, was arbitrary, erroneous, and irrational. *See Pacific Coast Medical Enterprises v. Harris*, 633 F.2d 123, 136 (9th Cir. 1980). These costs were incurred by St. James in the administration of its entire hospital facilities, administration that benefitted Medicare beneficiaries and those outside the program. They were no different than costs which the hospital could have been required to pay as interest on the grants it received under the Hill-Burton Act. Therefore, the Secretary's refusal to set aside disallowance of the uncompensated medical care costs incurred by St. James was an abuse of discretion and not in accordance with law. Her decision cannot stand. *Rapides General Hospital v. Matthews*, 435 F.Supp. 384 (W.D.La.1977), *vacated and remanded on other grounds*, No. 77–3125 (5th Cir., October 23, 1978) (unpublished order); *Presbyterian Hospital of Dallas v. Harris*, 638 F.2d 1381 (5th Cir. 1981); *cf. St. Johns Hickey Memorial Hospital v. Califano*, 599 F.2d 803 (7th Cir. 1979).

## B

The record also disclosed that in the same cost year St. James Hospital furnished Medicare beneficiaries bedside telephones and followed regulations and instructions in completing its cost report; it made entries with respect to the patient telephone costs which effected a self-disallowance. This use of the Secretary's regulation and instructions obviated the need for the Intermediary to disallow the costs which St. James wanted reimbursed; it accomplished what would have been the result had application for reimbursement been made to the Intermediary. The Board ruled, and the Secretary now insists, that because St. James followed regulations and effected a self-disallowance, it has no right to judicial review of the decision that disallowed reimbursement of costs incurred in furnishing Medicare patients with bedside telephones.

■ This, in the court's judgment, is a hypertechnical construction of the statute and regulations; it conflicts with recent lower decisions where jurisdiction was exercised over portions of costs for which reimbursement was claimed, costs reports having been reopened for some reimbursement claims other than those appealed by the provider. 42 U.S.C. § 1395*oo*(a) entitles a Medicare provider with a hearing before the Board with respect to Medicare reimbursements if the provider "is dissatisfied with a final determination of the . . . fiscal intermediary. . . ." The statute does not make an adjustment by the Intermediary a requirement for jurisdiction of the Board. What is required is dissatisfaction by the provider with the "amount of total program reimbursement".

■ In addition, the statutory language of 42 U.S.C. § 1395*oo*(d) provides the Board with power to make revisions on matters covered in a cost report being appealed "even though such matters were not considered by the intermediary in making such final determination." The purpose of 42 U.S.C. § 1395*oo*(d) is to give providers a forum for administrative and judicial relief with respect to claims of underpayment by the Medicare program. This special provision is not surprising in light of the statutory scheme. In the case before the court, a provider like St. James is not the beneficiary of the government programs, but a necessary participant in carrying them out. The Secretary has succeeded in establishing that 42 U.S.C. § 1395*oo* is the only avenue of relief available to a Medicare provider whether in a challenge to an Intermediary determination or in a direct attack on one of the Secretary's regulations. *See, e.g., Dr. John T. MacDonald Foundation v. Califano*, 571 F.2d 328 (5th Cir.) *cert. denied*, 439 U.S. 893, 99 S.Ct. 250, 58 L.Ed.2d 238 (1978); *Appalachian Regional Hospitals, Inc. v. United States*, 576 F.2d 858, 862 (Ct.Cl.1978); *Association of American Medical Colleges v. Califano*, 569 F.2d 101, 108–110 (D.C.Cir.1977). Therefore, the Board had jurisdiction over the disallowance; and

this court has jurisdiction of the case. *Cleveland Memorial Hospital, Inc. v. Califano*, 444 F.Supp. 125 (E.D.N.C.1978), 594 F.2d 993 (4th Cir. 1979). No useful purpose will be served in remanding it either to the Secretary or to the Board; to hold otherwise would subvert the statutory purpose of 42 U.S.C. § 1395*oo.*

Turning to the merits, the evidence shows without contradiction that the hospital furnished bedside telephones to Medicare patients for use by hospital personnel and physicians in connection with hospitalization and therapy. The telephones were used to alert cardiac resuscitation teams in the event of a cardiac arrest or other cardio-pulmonary emergency, to call hospital personnel who did inhalation and physical therapy, and summon those who transported patients and served them administratively in the discharge of their duties. Patient usage of the bedside telephones included communication with friends, family, and loved ones outside the hospital, but also included communication with hospital personnel such as the ombudsman, social workers, and those who admitted and discharged patients.

The hospitals supported their showing that bedside telephones had therapeutic value with clinical studies and expert medical testimony. Three were studies of patients with and without bedside telephones, and patients who were without bedside telephones when first tested but who were given telephones and later retested. The studies were (1) an attitudinal or feelings survey prepared and administered by Westinghouse Health Systems, (2) psychiatric anxiety and depress self-rating studies prepared by Dr. William Zung and administered by Westinghouse, and (3) psycholinguistic semantic differential studies prepared by Dr. Charles Osgood and administered by Westinghouse. In addition, clinical studies were prepared and administered by William Convey who monitored and measured the cardio-vascular responses of hospital in-patients to telephone conversations.

The clinicians described their work and gave expert testimony, including demonstrations that touched on levels of anxiety in the morbidity range, such as that shown to exist in a large percentage of patients without bedside telephones. Some gave the opinion that absence of a telephone causes adverse effects on a patient's cardio-vascular, gastro-intestinal, genital-urinary, skin and the central nervous systems. Doctors Zung and Convey testified that emotional or psychological stress has an effect on the heart rate, blood pressure, endocrin system, pituitary glands, and the adrenalin level of individuals. In addition, Dr. James Lynch and Dr. Sue Ann Thomas of the University of Maryland Psychophysiological Laboratories and Clinics testified as experts, they gave the opinion that patient bedside telephones had a definite therapeutic value.

The Intermediary did not rebut any of this evidence. It called one witness, a college professor whose testimony was an evaluative criticism of the case that had been made by the hospitals. His primary objection to the clinical studies was that they had been conducted by using an opportunity sample that involved patients in a hospital older than 18 years, and who consented to the testing. His view was that the test should have been a random sample that not only chose randomly among hospital patients, but also included nonhospitalized members of the community. He acknowledged, however, that most medical research proceeded by opportunity samples, and thus was statistically invalid.

The Board, after hearing the evidence, three members participating, one dissenting, found that

The Intermediary has presented evidence to demonstrate that its adjustment to disallow patient telephone costs is proper. In prior decisions this Board has ruled against Providers regarding the patient telephone issue and the Board has stated that, although Providers have argued that the telephone has therapeutic value, none of the Providers had conducted an indepth study to determine same. The Board notes that the Providers involved in this appeal have conducted indepth studies and offered expert testimony

which demonstrated that patient telephones have therapeutic value. The Board is very impressed with the Providers' arguments and, in fact, agrees that the patient telephone should be a covered service. However, this Board does not have the authority to rule on coverage issues and is locked into the Regulation that states that the patient telephone is a luxury item.

The Board finds that the controlling Regulations and Program Policy require the exclusion from allowable costs of all costs associated with telephone services and other personal comfort items which are used for the convenience of patients. It decided, over the objection of the dissenting member, that "the Intermediary's adjustment to disallow patient telephone costs is affirmed." Thus, despite recognizing the showing that patient bedside telephones had therapeutic value, and agreeing with the hospitals that such telephones should be a covered service, the Board ruled that it was bound, "locked into the regulation", 42 C.F.R. § 405.310(j) and so had to affirm the Intermediary's disallowance of the patient bedside telephone costs. Therefore, the issue to be resolved is whether the Secretary's action that allowed the Board's decision to stand is supported by substantial evidence when the record is viewed as a whole, 42 U.S.C. § 1395oo(d); 5 U.S.C. § 706(2)(A). In addition, this court must determine, since a challenge is made to the validity of a regulation promulgated by the Secretary, whether she exercised discretion through a reasoned consideration of the relevant factors and did not commit a clear error of judgment. *The Diplomat Lakewood, Inc. v. Harris,* 613 F.2d 1009, 1018–19 (D.C.Cir.1979).

■ "Substantial evidence" is not simply some evidence, or even a great deal; "[r]ather, the 'substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'" *Beavers v. Secretary of Health, Ed. & Welfare,* 577 F.2d 383, 387 (6th Cir. 1978). The term means more than a scintilla, and is such relevant evidence as a reasonable mind might accept as adequate to support a con-

clusion. *Beasley v. Califano,* 608 F.2d 1162, 1166 (8th Cir. 1979). It is a term of art that describes the framework within which a reviewing court judges an administrative record. *OKC Corporation v. Oskey Gasoline and Oil Company,* 381 F.Supp. 865, 868 (N.D.Tex.1974).

■ It is true that opinions of competent persons may constitute "substantial evidence" to sustain an administrative determination. *Richardson v. Perales,* 402 U.S. 389, 402, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971); *Turnbull, Inc. v. United States,* 389 F.2d 1007, 1014 (Ct.Cl.1967). However, an administrative decision is not supported by "substantial evidence" where it is contrary to testimony of those who conduct examinations and surveys, there is uncontradicted subjective evidence, and the only rebuttal is the opposing opinion of one who has never made surveys and who concedes unfamiliarity with the conditions and circumstances under which studies were made and upon which expert opinion is based. *Cf. Hayes v. Gardner,* 376 F.2d 517, 520–21 (4th Cir. 1967). That is the case here. The clinical surveys, testimony of witnesses, and the expert opinions of competent persons were met with the opposing view of a college professor who only criticized the overwhelming proof St. James and the Florida hospitals made in support of their claim that patient bedside telephones had therapeutic value. In fact, the Board did not disallow reimbursement of the patient telephone costs because there was a lack of evidence proving therapeutic value; it did so only because it felt bound by 42 C.F.R. § 405.310(j), the regulation proscribing such reimbursement adopted by the Secretary.

■ This regulation, in its pertinent part, provides that

Notwithstanding any other provisions of this Part 405, no payment may be made for any expenses incurred for the following items or services:

(a) . . .

(j) Personal comfort items and services (for example a television set, or telephone service, etc.); . . .

It was promulgated by the Secretary as interpretative of 42 U.S.C. § 1395y(a)(6) which provides that "[n]otwithstanding any other provision of this title, no payment may be made under Part A or Part B for any expenses incurred for items or services—which constitute personal comfort items...." Courts, however, will accord less deference to an interpretive rule than to a legislative one. *Shell Oil Company v. Federal Power Commission*, 491 F.2d 82, 88 (5th Cir. 1974); *see O'Neill v. United States*, 281 F.Supp. 359, 363 (N.D.Ohio 1968), *aff'd*, 410 F.2d 888 (6th Cir. 1969). "An interpretive rule is simply the agency's opinion of the meaning of a statute. It does not bind a reviewing court, which must examine the interpretation just as it would approach any other question of law, although a certain deference is given to the agency's expertise. *Haddon Tp. Bd. of Ed. v. New Jersey Dept. of Ed.*, 476 F.Supp. 681, 691 (D.N.J.1979); *cf. Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944); *see* Davis, Administrative Law Treatise § 7:8 (2d ed).

Given whatever deference this regulation deserves, it nonetheless is clear that when Congress said that there shall be no Medicare reimbursement of expenses incurred for "personal comfort items", it did not prohibit the reimbursement of costs incurred by a Medicare Provider in furnishing patients with bedside telephones. The phrase "which constitute personal comfort items..." is unclear; at best, it is ambiguous. *Smith v. Wehn*, 318 F.2d 325, 327 (CCPA 1963); *see City of Milwaukee v. Lindner*, 98 Wis.2d 624, 297 N.W.2d 828, 832 (1980). This being so, resort must be had to the history of the legislation because "frequently the legislative history of a statute is the most fruitful source of instruction as to its proper interpretation...." *Flora v. United States*, 362 U.S. 145, 151, 80 S.Ct. 630, 633, 4 L.Ed.2d 623 (1960). What does this history show?

It appears that when the Senate considered the Medicare Act to determine whether an item or service was covered or non-covered personal, it had the Report of its Committee on Finance No. 404 which accompanied H.R.6675, the companion bill in the House. As to covered in-patient hospital benefits, it was recommended that the program pay the reasonable costs of service ordinarily provided to in-patients by hospitals (other than certain items subsequently discussed), including new services and techniques as they are adopted in the future. However, "[i]tems supplied at the request of the patient for his convenience, such as television rental in hospitals, would not be paid for under the program." S.Rep. No.404 (Finance Committee), 89th Cong., 1st Sess. (June 30, 1965), reprinted in [1965] U.S.Code Cong. & Admin.News 1943, 1967, 1969; H.Rep.No.213 (Committee on Ways and Means), 89th Cong., 1st Sess. 25 (March 29, 1965). The report recommended that the proposed bill exclude certain health items and services from coverage under both the hospital insurance and the voluntary supplementary medical insurance programs. For example, barred would be payments for health items or services that are not necessary for the treatment of illness or injury, or to improve the functioning of a malformed body member. Payments would be made for the rental of a special hospital bed to be used by a patient in his home only if it was a reasonable and necessary part of a sick person's treatment. It was emphasized that "[s]uch potential personal comfort items and services as massages and heat lamp treatments would only be covered where they contribute meaningfully to the treatment of an illness or injury or the functioning of a malformed body member...." *Id.* at 1989.

Thus, there is a clear suggestion that Congress intended the test of coverage in the Medicare program to be whether a service contributed meaningfully to the treatment of an illness, an injury or to the functioning of a malformed body member. This intent can be traced to November 1963 when the House Committee on Ways and Means considered H.R.3920, a legislative proposal that preceded the Medicare Act. On that occasion, the Secretary of HEW provided a description of the supplies and services to be covered by the contemplated

statute: "Extra items, supplied at the request of the patient for his convenience, such as telephones in hospitals, would not be paid for." Hearings before the Committee on Ways and Means on H.R.3920, 88th Cong., 1st and 2nd Sess., p. 41. When, however, the legislative proposals were consolidated by the Committee on Ways and Means to produce H.R.6675 reported out March 29, 1965, the reference to patient telephones was replaced by the words "television rentals". Congress was then told that "[i]tems supplied at the request of the patient for his convenience, such as television rental in hospitals, would not be paid for under the program." H.R. (Committee on Ways and Means) No. 213, 89th Cong., 1st Sess., March 29, 1965, p. 25. This legislative evolution supports the argument made by St. James Hospital in this case that the substitution of television rental as a non-reimbursable service in place of the HEW suggestion of patient telephones, establishes that Congress did not intend to make patient telephones *per se* excluded from Medicare coverage. What is evident is a congressional intention to exclude such services from coverage if they are requested for the convenience of a patient and have no meaningful relation to the treatment of an illness or an injury or the functioning of a malformed body member.

■ In this court's judgment, St. James Hospital is correct in insisting that "[t]he determination of whether an item or service is a non-reimbursable personal comfort item or service depends upon its use and function in the delivery of health care and the recuperative process." Brief for Plaintiff at 41. The Medicare Act reimburses hospitals providing services to Medicare beneficiaries the lesser of their charges or the reasonable cost of furnishing such services. 42 U.S.C. § 1395f. "Reasonable cost" is the actual cost of providing in-patient hospital care. 42 U.S.C. § 1395x(v)(1)(A). The term "actual cost" is all inclusive unless specifically identified and the exclusions contained in 42 U.S.C. § 1395y. In view of the legislative history and the words "which constitute personal comfort items" used by Congress in 42 U.S.C. § 1395y(a)(6), the Secre-

tary's interpretation contained in the regulation 42 C.F.R. § 405.310(j) is clearly erroneous. The simplistic prohibition of reimbursement for expenses for "[p]ersonal comfort items and services (for example a television set or telephone service, etc.)" fails to distinguish between the telephone service furnished a patient at his request and for his comfort and a bedside telephone furnished by a hospital in the delivery of health care and the recuperative process.

■ Generally, the standard for reviewing a regulation governing Medicaid reimbursements is whether the regulation is reasonably related to the purposes of the statute. *Johnson's Professional Nursing Home v. Weinberger*, 490 F.2d 841, 844 (5th Cir. 1974); cf. *Arkansas Pharmacists Ass'n v. Harris*, 627 F.2d 867 (8th Cir. 1980). Such a regulation must be upheld unless it is inconsistent with the enabling legislation. *Green v. Philbrook*, 427 F.Supp. 834, 838 (D.C.Vt.1977), *reversed on other grounds*, 576 F.2d 440 (2nd Cir. 1978); and see 42 U.S.C. § 1302. In this case, 42 C.F.R. § 405.310(j) is not reasonably related to the purposes of the Medicare Act; it is inconsistent with its objectives. The principal purpose of the Medicare program is providing Medicare beneficiaries with medical services, accomplished by the reimbursement of provider hospitals their charges or the reasonable cost of furnishing such services, 42 U.S.C. § 1395f(a); and the Secretary is prohibited from adopting regulations which implement the statute in such a way that "the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs . . . will be borne by individuals not so covered. . . ." 42 U.S.C. § 1395x(v)(1)(A). The regulation in question prevents the paying of provider hospitals for their charges or the reasonable costs of furnishing Medicare beneficiaries with bedside telephones.

Moreover, it is inconsistent with the underlying legislation because 42 U.S.C. § 1395y(a)(6) prohibits cost reimbursements for items or services, "which constitute personal comfort items." The Secretary's sub-

ordinates acknowledged a showing that a bedside telephone furnished a patient by a hospital had therapeutic value; it is essential to the delivery of health care. A bedside telephone furnished by a hospital is not an item of comfort; it is part of hospital therapy. Accordingly, this court concludes that the Secretary's action is not supported by substantial evidence, *Memorial, Inc. v. Harris*, 655 F.2d 905, 912 (9th Cir. 1980); it is obvious that the Secretary committed an error of judgment in construing and applying 42 C.F.R. § 405.310(j) to exclude from reimbursable costs St. James incurred in furnishing Medicare patients with bedside telephones. Thus, under the circumstances, the Secretary's action was arbitrary and capricious. *Pacific Coast Medical Enterprises v. Harris*, 633 F.2d 123 (9th Cir. 1980). The refusal to reimburse these costs cannot stand. *AMI-Chanco v. United States*, 576 F.2d 320 (Ct.Cl.1978).

## IV

For the foregoing reasons, an appropriate judgment will be entered in favor of the plaintiff St. James Hospital and against Patricia Roberts Harris, Secretary, Department of Health and Human Services.[1]

So ordered.

---

1. Patricia Roberts Harris, who is here sued only in her official capacity, has been succeeded in office by Richard S. Schweiker. However, for literary reasons, there having been no motion for substitution, the court has treated the case as against the Secretary during whose term of office this controversy arose. Under the circumstances, by operation of law, the substitution is automatic; and the judgment in this case is against the current incumbent who becomes the named defendant. *See Bracco v. Lackner*, 462 F.Supp. 436 (N.D.Cal.1978); Fed. R.Civ.P. Rule 25(d), 28 U.S.C.A.